UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,<br><br>    Plaintiff/Petitioner,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE and, NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,<br><br>    Defendants/Respondents. | COMPLAINT AND PETITION TO VACATE ARBITRATION AWARDS<br><br>Case No. 08CV6254<br>RHK/JJG |

The National Football League Players Association ("NFLPA" or "Plaintiff/Petitioner"), for its Complaint and Petition to Vacate Arbitration Awards, against the National Football League ("NFL") and the NFL Management Council ("NFLMC") (collectively, "Defendants/Respondents"), alleges as follows:

## NATURE OF THE PROCEEDING

1.    This is an action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to vacate two Arbitration Awards (collectively, the "Awards") issued on December 2, 2008 by Jeffrey Pash, Executive Vice President of the NFL, and the "Hearing Officer" and designee of the NFL Commissioner in the arbitration proceedings. The Awards were issued in appeals by NFL players Kevin Williams, Pat Williams, Charles Grant, Deuce McAllister and Will Smith (the "Players") -- each of whom is a player member of the NFLPA -- under the NFL Policy on Anabolic Steroids and Related Substances ("NFL Steroids Policy" or "Policy"), which policy was adopted pursuant to the

- 1 -
COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD

SCANNED DEC 04 2008 U.S. DISTRICT COURT MPLS

Dockets.Justia.com

Collective Bargaining Agreement between the NFL and the NFLPA, dated March 8, 2006 ("CBA").

2. One Award was issued as to the appeals of Kevin and Pat Williams. The other Award was issued as to the appeals of Messrs. Grant, McAllister and Smith. A true and correct copy of the Awards is attached hereto as Exhibits A and B, respectively. Both Awards, however, concern the same basic issue: the suspension of the Players under the NFL Steroids Policy for using a potentially harmful diuretic drug "bumetanide" -- in a product known as "StarCaps" -- where both the NFL-appointed doctor and the NFL lawyer who administer the NFL Steroids Policy, and who, in the case of the doctor, determined that the players would be suspended, knew that StarCaps contained bumetanide (even though the drug does not appear on StarCap's ingredient list), but never advised the Players, the NFLPA or any other NFL players, of this critical fact. In short, the officers who administer the NFL Steroids Policy breached their fiduciary duties to the Players, misled the Players, and endangered their physical well-being.

3. These breaches of fiduciary duty by the involved NFL officials fatally tainted the suspensions so that enforcing the Awards would unfairly punish the players and condone the improper behavior and breaches of duty by the NFL, in violation of public policy and the essence of the CBA. The Awards must also be vacated because the office of Mr. Pash – the arbitrator in the proceedings – was directly involved in the wrongful NFL conduct at issue.

## JURISDICTION AND VENUE

4. This action arises under Section 301 of the LMRA as the award was made pursuant to a collective bargaining agreement.

5. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, in that it arises under Section 301 of the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 185.

6. Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185.

## PARTIES

7. The NFLPA is a union certified by the National Labor Relations Board as the exclusive bargaining representative of all NFL players. The NFLPA represents players employed in this judicial district for the purposes of collective bargaining and implementation and enforcement of the NFL Steroids Policy, including Minnesota Vikings players Kevin Williams and Pat Williams.

8. The NFL is an unincorporated association comprised of the employer member clubs of the NFL, one of which is the Minnesota Vikings, which is located in this district. The NFL derives revenue from the State of Minnesota through, among other things, advertising, ticket sales, merchandising and broadcasting revenue.

9. The NFL Management Council is the exclusive multi-employer bargaining representative of the NFL member Clubs. It is the NFL entity that is the formal party to the CBA with the NFLPA.

## FACTUAL BACKGROUND

### *NFL Policy on Anabolic Steroids and Related Substances*

10. The NFL Steroids Policy was adopted pursuant to Article XLIV, Section 6(b) of the current collective bargaining agreement between the NFLPA and the NFL, dated March 8, 2006.

11. The NFL Steroids Policy prohibits the use of steroids, growth hormones, and other similar substances. However, the Policy also prohibits the use of so-called "blocking" or "masking" agents, including diuretics.

12. The Policy sets forth procedures for conducting testing for prohibited substances and taking disciplinary measures against players who have positive test results.

13. The NFL Steroids Policy is "conducted under the auspices of the NFL Management Council." The program is directed by the Independent Administrator on Anabolic Steroids and Related Substances (the "Independent Administrator") who is selected solely by the NFL, not by the NFLPA. Dr. John Lombardo is, and at all relevant times was, the Independent Administrator.

14. The NFL Steroids Policy also provides for a Consulting Toxicologist on Anabolic Steroids and Related Substances (the "Consulting Toxicologist") who similarly is appointed solely by the NFL, and who consults on testing procedures and results and other issues referred to him by the Independent Administrator. Dr. Bryan Finkle is, and at all relevant times was, the Consulting Toxicologist.

15. Under the Policy, NFL players who receive a positive test result are subject to suspension and other disciplinary measures. The first time a player tests positive he is subject to a suspension without pay for a minimum of four regular season and/or postseason games. Because each NFL season is comprised of only sixteen regular season games, and only a few postseason games for which

only 12 of 32 NFL clubs initially qualify, a four game suspension would have a severe harmful effect on the career of a suspended player.

16. Under the Policy, players have a right to appeal the result to the NFL in a hearing at which either the NFL Commissioner or his designee presides as Hearing Officer.

17. The Independent Administrator has sole discretion to, among other things, make determinations regarding the method by which players will be subjected to testing, select which players will be tested, decide when tests will be administered, analyze test results data over time, conduct medical evaluations associated with the possible use of prohibited substances, grant 'therapeutic use exemptions," communicate with, instruct and oversee the work of the specimen collection group, and certify violations for disciplinary or administrative action.

18. The NFL Steroids Policy also directs the Independent Administrator to make himself available for consultation with players, oversee the development of educational materials, participate in research on steroids, and serve on the NFL's Advisory Committee on Anabolic Steroids and Related Substances.

19. The Policy states that one of the primary factors underlying the Policy's concern with the use of prohibited substances are adverse health effects.

20. The Policy instructs NFL players to contact Dr. Lombardo, the Independent Administrator, if they have questions or concerns about a particular

dietary supplement or other product. The Policy states that the Independent Administrator is authorized to respond to players' questions regarding specific supplements. The Policy also identifies a Supplement Hotline that players may contact with questions.

21. By virtue of his duties and responsibilities to NFL players under the Policy, and his conduct thereunder, as well as his professional responsibilities as a physician, Dr. Lombardo is a fiduciary with respect to the players subject to the Policy.

22. In addition, Adolpho Birch, the Vice President of Law and Labor Policy in the NFL, a senior NFL lawyer, oversees the operation of the NFL Steroids Policy for the NFL. Upon information and belief, in that role, Mr. Birch is the principal NFL person with responsibility for the day-to-day administration of the Policy, subject to oversight by Jeffrey Pash, Executive Vice President and senior legal officer of the NFL, and Roger Goodell, Commissioner of the NFL. Mr. Birch interacts with Dr. Lombardo on a regular basis and, upon information and belief, is the NFL person responsible for the dissemination of information from Dr. Lombardo to NFL clubs, and for NFL communications with players concerning the Policy. Upon information and belief, Mr. Birch has overseen the Policy for the NFL since at least 2000.

### Dr. Lombardo, Mr. Birch and the NFL Knew that StarCaps Contained the Diuretic Bumetanide, A Potentially Dangerous Substance, But Did Not Inform The Players

23. Upon information and belief, in or about November 2006, an NFL player tested positive for bumetanide, a diuretic prohibited under the Policy. StarCaps, a weight-loss supplement, was identified as the source. The Consulting Toxicologist, Dr. Finkle, then ordered the NFL laboratory to conduct an investigation into StarCaps. The analysis of StarCaps confirmed that bumetanide was an undisclosed ingredient.

24. Dr. Finkle discussed the results of the StarCaps analysis with Dr. Lombardo. Dr. Finkle thus testified:

> My discussions related to my concern for the health of players that may be ingesting a very potent diuretic drug without the supervision of a physician and without it being taken for a diagnosed medical condition. <u>I told Dr. Lombardo about my concern because this particular drug had not been detected at least within my experience in our Program prior and asked him as a physician to take my advice and pass it on or deal with it as his professional duty required him to do so.</u>

(Emphasis added).

25. Dr. Finkle further testified:

> [T]hey analyzed them [StarCaps] at the laboratory and they found that the StarCaps did indeed contain Bumetanide . . . that led to my reporting back to Dr. Lombardo that we had, in fact, confirmed that the StarCaps did contain Bumetanide and, therefore, could have been the source of the diuretic Bumetanide in the urine sample in question.
>
> After that I think there was an additional discussion, the last discussion perhaps with Dr. Lombardo in the context of what, just this first positive. We've had many discussions since on a more general basis, but on the context of this first discussion, the last discussion I had with him was how this might be best communicated ultimately to the players. And we talked about that a little bit. And it was obvious that Dr. Lombardo would communicate that with Management Council staff here at the League and move forward from that point.

COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD

26. However, upon information and belief, Dr. Lombardo did not communicate to the NFL players or the NFLPA the information he had received about StarCaps containing a potent and potentially dangerous diuretic. Moreover, upon information and belief, the unidentified NFL player who initially tested positive for bumetanide by taking StarCaps was never subject to any discipline under the Policy by Dr. Lombardo or the NFL.

27. Instead, Dr. Lombardo merely sent a general notice to NFL players, echoing letters already appended to the Policy, about the risks of weight reduction and dietary supplement products generally, without any reference to StarCaps.

28. Appendix G to the Policy is a letter from Dr. Lombardo to NFL Players regarding dietary supplements generally. Dr. Lombardo advised in that letter that over-the-counter dietary supplements' ingredients are not checked by independent agencies and may pose risks. The letter does not discuss StarCaps or bumetanide.

29. Upon information and belief, after Dr. Lombardo received the information about StarCaps containing bumetanide, he did notify Mr. Birch and the NFL about StarCaps specifically and had the manufacturer, Balanced Health Products, added to the list of companies with which player endorsement or other business relationships are prohibited. Dr. Lombardo also sent notices to players in

- 8 -
COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD

or about July 2007 and July 2008 warning them about weight reduction products generally. The July 2007 and July 2008 notices to players did not identify StarCaps.

    30. Dr. Lombardo testified:

> Q. <u>Nowhere in those two memoranda do you mention the term StarCaps, do you?</u>
>
> A. <u>No</u>, because basically if you -- if I put the word StarCaps in specifically, then all those other supplements, we fear the next thing would be you didn't mention this supplement or that supplement. So I sent it with something to warn them of all the weight reduction products out there. . .
>
> Q. You testified that the reason you didn't include StarCaps is that if you had then you anticipated players would use your failure to include another weight reduction supplement as an excuse if that other weight reduction supplement was a source of a banned substance, is that what your testimony was?
>
> A. Yes. I felt it was more important to get out a warning about all weight reduction supplements . . .

(Emphasis added).

    31. Dr. Finkle testified that Dr. Lombardo stated that he did not make the specific disclosure to NFL players about StarCaps and bumetadine due to concern about his own personal legal liability:

> Q. What reason did Dr. Lombardo tell you he decided not to make that specific disclosure?
>
> A. It was a very general conversation. I will distill it down to two reasons; one was he didn't feel he had adequate evidence that all of StarCaps products contained this drug, and, therefore, was very concerned about making that allegation, if you will. <u>And secondly, he was concerned about legal liability.</u>
>
> Q. To whom?
>
> A. <u>For himself.</u> That if he publicly made a statement that this product, by this company contained this particular drug and he considered this dangerous and so on and so forth, that the company might indeed sue him and he might find -- and he said to me that that had happened in his

experience to other people and other organizations that had made allegations against supplement companies. And those people had been ruined by these subsequent consequent legal proceedings.

32. Dr. Lombardo did, upon information and belief, inform Adolpho Birch, who oversees the NFL Steroids Policy for the NFL, about the presence of bumetadine in StarCaps and the potential health risks from StarCaps. Indeed, upon information and belief, Mr. Birch considered warning the Food and Drug Administration of the presence of bumetanide in StarCaps, but did not do so.

33. As discussed in Paragraph 22 above, Mr. Birch is a senior lawyer at the NFL and, upon information and belief, works under the supervision of Jeffrey Pash, the chief legal officer of the NFL, including in connection with appeals under the NFL Steroids Policy. Notwithstanding their knowledge, at no time did the NFL warn NFL players or the NFLPA of the presence of bumetanide in StarCaps and potential health risks of the product.

34. Further, it was completely improper for Mr. Pash to be the Hearing Officer to determine whether the suspensions were valid. The Legal Department of the NFL, which Mr. Pash oversees, was directly involved in the wrongful NFL behavior at issue, and the hearing involved claims concerning his subordinate's conduct overseeing the Policy, and the failure of Mr. Birch and the NFL to warn players about a dangerous drug. Mr. Pash could not be a fair arbitrator in these unique circumstances in which his office was directly implicated.

COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD

### *The Players Are Suspended Under the Policy for Taking StarCaps*

35.  Upon information and belief, Kevin Williams, a defensive tackle for the Minnesota Vikings, took StarCaps. Mr. Williams never received any information from the Independent Administrator or the NFL regarding StarCaps containing bumetanide, and he was not otherwise aware that StarCaps contained bumetanide. Urine samples taken from Mr. Williams on or about July 26, 2008, after he took StarCaps, tested positive for bumetanide. Mr. Williams was subsequently advised that, pursuant to the Policy, he would be suspended for four games.

36.  Upon information and belief, Pat Williams, a defensive tackle for the Minnesota Vikings, took StarCaps. Mr. Williams never received any information from the Independent Administrator or the NFL regarding StarCaps containing bumetanide, and he was not otherwise aware that StarCaps contained bumetanide. Urine samples taken from Mr. Williams on or about July 26, 2008, after he took StarCaps, tested positive for bumetanide. Mr. Williams was subsequently advised that, pursuant to the Policy, he would be suspended for four games.

37.  Upon information and belief, Charles Grant, a defensive end for the New Orleans Saints, took StarCaps. Mr. Grant never received any information from the Independent Administrator or the NFL regarding StarCaps containing

bumetanide, and he was not otherwise aware that StarCaps contained bumetanide. Urine samples taken from Mr. Grant on or about August 9, 2008, after he took StarCaps, tested positive for bumetanide. Mr. Grant was subsequently advised that, pursuant to the Policy, he would be suspended for four games.

38.  Upon information and belief, Will Smith, a defensive end for the New Orleans Saints, took StarCaps. Mr. Smith never received any information from the Independent Administrator or the NFL regarding StarCaps containing bumetanide, and he was not otherwise aware that StarCaps contained bumetanide. Urine samples taken from Mr. Smith on or about July 25, 2008, after he took StarCaps, tested positive for bumetanide. Mr. Smith was subsequently advised that, pursuant to the Policy, he would be suspended for four games.

39.  Upon information and belief, Deuce McAllister, a running back for the New Orleans Saints, took StarCaps. Mr. McAllister never received any information from the Independent Administrator or the NFL regarding StarCaps containing bumetanide, and he was not otherwise aware that StarCaps contained bumetanide. Urine samples taken from Mr. McAllister on or about August 20, 2008, after he took StarCaps, tested positive for bumetanide. Mr. McAllister was subsequently advised that, pursuant to the Policy, he would be suspended for four games.

## *The Awards Rendered By Mr. Pash Uphold the Suspensions*

40. Each of the Players appealed his suspension pursuant to the Policy. Hearings were held on or about November 18, 2008 for Messrs. Grant, Smith, and McAllister before Hearing Officer Jeffery Pash, Executive Vice-President and General Counsel of the NFL. Hearings were held on or about November 20, 2008 for Messrs. Kevin and Pat Williams – also before Mr. Pash. In each of these hearings, Mr. Pash was the designated representative of the NFL Commissioner.

41. Upon information and belief, the Players presented evidence and argument to Mr. Pash that Dr. Lombardo, Mr. Birch and the NFLMC had withheld information from the Players about StarCaps in violation of their fiduciary and other duties.

42. On December 2, 2008, Mr. Pash, on behalf of the NFL Commissioner, issued two decisions in these appeals. Both decisions sustained the suspensions of the Players on the basis, among other things, that the NFL, Dr. Lombardo and Mr. Birch had no duty to provide the information they had gained about StarCaps to the Players, even though they knew StarCaps contained a prohibited substance under the Policy and could endanger the health and well-being of the Players.

# COUNT I

## VACATUR OF ARBITRATION AWARD/BREACH OF CONTRACT

43. Plaintiff/Petitioner repeats and realleges Paragraphs 1-42 as if set forth fully herein.

44. Plaintiff/Petitioner NFLPA moves to vacate the Awards.

45. Labor arbitration awards are vacated where (a) the award runs counter to public policy, (b) the award does not draw its essence from the collective bargaining agreement, or (c) the award was procured by fraud. Labor arbitration awards also are set aside where the proceedings are fundamentally unfair or there was evident partiality in the arbitrators.

46. The Awards must be vacated because they are contrary to public policy, as they condone a breach of fiduciary duty and conduct that endangers the public health, they are contrary to the essence of the Policy which is designed to protect player health, and they were rendered by an arbitrator who was not capable of conducting a fair hearing over conduct in which his office was involved.

47. It would be contrary to public policy to permit the Awards to be enforced where they are based upon breaches of fiduciary duty and failures of duties to disclose by the physician administering the Policy, the NFL lawyer and executive overseeing the policy, and the NFL itself. Otherwise, the courts would be countenancing and in fact encouraging such breaches, which were a danger to public health.

48. The arbitration proceedings also were fundamentally unfair and the result of evident partiality. The arbitrator affirming the suspensions – NFL Executive Vice President Jeffrey Pash – was reviewing and immunizing misconduct by his own office, in which his own subordinate was involved.

49. Further, the Awards do not draw their essence from the CBA since they violate the purpose of the Policy by endangering player health.

WHEREFORE, in accordance with Section 301 of the LMRA, 29 U.S.C. § 185, Plaintiff/Petitioner requests that this Court (1) vacate the Awards in their entirety, and (2) grant such other and further relief as the Court may deem just and proper.

Dated: December 4, 2008

Respectfully submitted,

DEWEY & LEBOEUF, L.L.P
Jeffery L. Kessler (pro hac vice application pending)
David G. Feher (pro hac vice application pending)
David L. Greenspan (pro hac vice application pending)
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000
(212) 259-6333
jkessler@dl.com
dfeher@dl.com
dgreenspan@dl.com

LINDQUIST & VENNUM, P.L.L.P.
Edward M. Glennon #0035403
Mark A. Jacobson #0188943
Anthony N. Kirwin #0387847
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 371-2488
(612) 371-3207 (fax)
eglennon@lindquist.com
mjacobson@lindquist.com
akirwin@lindquist.com

*Attorneys for Plaintiff/Petitioner National Football League Players Association*