UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Football League                                   Civil No. 08-6254 (PAM/JJG)
Players Association,

                              Plaintiff,

v.

National Football League, and
National Football League
Management Council

                              Defendants.

_____                **MEMORANDUM AND ORDER**

Kevin Williams and Pat Williams,                          Civil No. 08-6255 (PAM/JJG)

                              Plaintiffs,

v.

National Football League, John
Lombardo, M.D., Brian Finkle,
and Adolpho Birch,

                              Defendants.

_____

        This matter is before the Court on cross-Motions for Summary Judgment filed by all

parties in these related cases.

**BACKGROUND**

        In July and August 2008, players in the National Football League ("NFL") submitted

to random testing for steroids and other substances in accordance with  the NFL's Policy on

Anabolic Steroids and Related Substances (the "Policy").   (Greenspan Decl. Ex. 1

(hereinafter "Policy") at 4 ("Each week during the preseason and regular season, ten (10) players on every team will be tested.").)  The Policy's testing regimen is administered by Defendant Dr. John Lombardo, who is denominated the "Independent Administrator" of the Policy.  (Id. at Appx. B.)  As the Independent Administrator, Lombardo has "the sole discretion to make determinations regarding the method by which players will be subjected to testing each week; selecting which players will be tested each week; deciding when tests will be administered; . . . analyzing test results; . . . and certifying violations for disciplinary or administrative action."  (Id. ¶ 2.)  He is also responsible for "consult[ing] with players and Club physicians, oversee[ing] the development of educational materials, [and] participat[ing] in research on steroids . . . ."  (Id.)

In late September and early October 2008, five players—Kevin Williams and Pat Williams of the Minnesota Vikings and Charles Grant, Deuce McAllister, and Will Smith of the New Orleans Saints—were informed that their samples had tested positive for bumetanide, a prescription diuretic that is banned under the Policy because it may mask the presence of steroids.[1]  The Policy provides that "[t]he first time a player violates this Policy by testing positive [for a banned substance] . . . he will be suspended without pay for a minimum of four regular and/or postseason games."  (Id. ¶ 6 (emphasis in original).)  Thus, the NFL suspended the players for four games.

The players appealed their suspensions.  Under the terms of the Policy, appeals are

---

[1]  There is no allegation that any of the players tested positive for any steroid.

presented at a hearing before the Commissioner or his designee at which the player may be represented by counsel and may present evidence.  (Id. ¶ 10.)  The Policy further provides that the Hearing Officer's written decision "will constitute a full, final, and complete disposition of the appeal" and "will be binding on all parties."  (Id.)  The Commissioner designated Defendant Jeffrey Pash, the NFL's chief legal officer, to be the Hearing Officer in the appeals.[2]

At the hearing, the players presented evidence that they took an over-the-counter dietary supplement called "StarCaps," which ostensibly provides weight-loss benefits. Although bumetanide is not listed as an ingredient in StarCaps, the evidence established that the StarCaps the players took contained bumetanide.  Thus, the players all unknowingly ingested bumetanide.

Under normal circumstances, the unknowing ingestion of a banned substance will not excuse a violation of the Policy.  The Policy warns repeatedly that players are responsible for what is in their bodies, and states that "a positive test result will not be excused because a player was unaware that he was taking a [banned substance]."  (Id. ¶ 3.E.)  The players argued, however, that theirs was not a normal circumstance.  The evidence established that Lombardo and the NFL knew in 2006 that at least some StarCaps capsules contained bumetanide.  Indeed, after several players tested positive for bumetanide after taking

_____

[2]  The Vikings players' appeal was heard together and the Saints players' appeal was heard together.  Thus, there are two hearings and arbitration records at issue.  However, because the parties stipulated that the evidence presented at one hearing would be available for consideration at the other hearing, the Court will discuss a single "hearing."

StarCaps in 2006, Lombardo and the NFL asked an independent laboratory to analyze StarCaps for the presence of bumetanide.[3] The laboratory found bumetanide in StarCaps and informed Birch and Lombardo of the results. The laboratory also published the results of the tests in the November/December 2007 <u>Journal of Analytical Toxicology</u>. After this testing, Defendant Adolpho Birch, the NFL's Vice President of Law and Labor Policy, informed the National Football League Players Association ("NFLPA" or "Union") that players were prohibited from providing endorsements for Balanced Health Products, the distributor of StarCaps. (Saints players Arbitration R. Ex. 53.) Birch also sent a memorandum to each team's president, general manager, and head athletic trainer that players were not to endorse Balanced Health Products. (<u>Id.</u> Ex. 52.) Neither Lombardo nor Birch, however, told the teams, trainers, agents, or players that StarCaps contained bumetanide or any banned substance. Moreover, despite the lab director's request that the NFL report the information about StarCaps to the Food & Drug Administration ("FDA"), Birch declined to do so. (Vikings players Appeal Hr'g T. at 238 (Lombardo Test.).)

In decisions dated December 2, 2008, Mr. Pash upheld the suspensions of all five players. (Saints players Arbitration R. Ex. 1; Vikings players Arbitration R. Ex. 1.) He discussed the Policy's position on dietary supplements, noting that players received repeated warnings that over-the-counter supplements might contain ingredients not listed on the label and that a positive test would not be excused because the supplement's ingredient list did not

---

[3] Lombardo did not refer for discipline any players who tested positive for bumetanide in 2006. (Lombardo Dep. at 38.)

disclose the presence of a banned substance.  (<u>See, e.g.</u>, Vikings players Arbitration R. Ex.

1 at ¶¶ 7-9 (discussing numerous memoranda to players regarding supplements).)  Mr. Pash

then turned to the language of the Policy as applied to the facts at hand:

> There is no question that the policy embodies a collectively-bargained rule of strict liability—a rule that players alone are responsible for what is in their bodies; that inadvertent or unknowing use of a prohibited substance will not excuse a positive test; and that supplements are used at the player's own risk.  Similarly, there is no question that at the time that he used StarCaps as well as at the time of the hearing, each player clearly understood that rule and what it means.

(<u>Id.</u> at 6.)

None of the players contested their positive test results.  They instead argued that

those positive results should be excused "because the NFL and Dr. Lombardo were aware

that StarCaps contained an undisclosed banned substance, bumetanide, but did not

specifically advise NFL players of this fact."  (<u>Id.</u>)  As Mr. Pash put it in his decisions on the

appeals, "even though [none of the] player[s] contacted Dr. Lombardo about StarCaps (as the

Policy directs them to do), they contend that where specific evidence is available about a

particular product, a specific warning is required, and the failure to extend such a warning

should excuse any violation of the Policy associated with that product."  (<u>Id.</u>)  Mr. Pash

found that the players' position "flies in the face of nearly two decades of history" because

the Policy has always adhered to the "fundamental principle" of strict liability that "puts the

burden on players to be responsible and accountable for what is in their bodies."  (<u>Id.</u> at 7)

Mr. Pash thus concluded that the language of the Policy required that the suspensions be

upheld.  (<u>Id.</u> at 9.)

Kevin Williams and Pat Williams filed suit in Minnesota state court the day after Mr.

Pash issued his decision.  The state-court judge issued a temporary restraining order ("TRO")

blocking the suspensions.  The next day, the NFLPA, on behalf of the Saints players and the

Williamses, brought suit in federal court and the NFL removed the Williamses' state lawsuit

to federal court.  This Court ultimately granted the NFLPA's motion for a preliminary

injunction and declined to overturn the TRO entered in state court, thus allowing the players

to continue playing until the end of the NFL's season.  The Court found that the players and

Union had shown a "substantial question" on the merits of their claim that Mr. Pash was

biased and on their claim that Mr. Pash's decision was contrary to public policy (Order of

Dec. 11, 2008, at 12, 16), but that the players and Union had failed to show a substantial

question on the merits of their claim that the decisions did not draw their essence from the

Policy.  (Id. at 14.)  These determinations were necessarily preliminary, however, and do not

constitute law of the case for the purposes of the instant Motions.  SEC v. Zahareas, 272 F.3d

1102, 1105 (8th Cir. 2001).

After granting the preliminary relief the players and Union requested, the Court

ordered the parties to engage in expedited discovery and thereafter to submit dispositive

motions, if appropriate.  Despite the Court's clear guidance that discovery was necessary, the

parties (and the NFL in particular) engaged in what can only be called gamesmanship,

requiring the Magistrate Judge to extend far greater oversight of the discovery process than

should otherwise have been required.  Not only are such obstructive litigation tactics

unnecessary and expensive, but they were contrary to the explicit dictates of the Court.  The

parties are fortunate that the Magistrate Judge so ably shepherded discovery and mediated the parties' disputes.  This Court would not have looked favorably on the parties' conduct should it have had occasion to consider the consequences of that conduct.

Discovery revealed additional facts not found in the arbitration record.  After the Williamses were informed of their positive test results, they threatened to bring a lawsuit claiming, among other things, a violation of the Americans with Disabilities Act.  In response to these threats, Mr. Pash, in his role as the NFL's chief legal officer, gave legal advice to the NFL and to the Vikings.  According to the NFLPA and the Williamses, Mr. Pash's early involvement in the subject matter of the arbitrations further bolsters their claim that Mr. Pash was biased and should not have arbitrated the appeals.

Discovery also revealed a memorandum from the NFLPA to players' agents regarding the distributor of StarCaps.  In that memorandum, the NFLPA informed the agents that "Balanced Health Products, which distributes StarCaps, has been added to the list of prohibited dietary supplement companies.  Players are prohibited from participating in any endorsement agreement with this company or using any of their products."  (12/20/2006 Robinson memo (emphasis added).)  The NFL contends that this memorandum eviscerates the players' claims that they were not informed about StarCaps prior to their positive tests.

The final relevant evidence surrounds the first "cluster" of positive bumetanide tests in 2006.  These positive tests and the tested players' statements that they took StarCaps prior to the positive tests gave rise to Lombardo's request that a laboratory analyze StarCaps for the presence of bumetanide, as discussed above.  As noted, Lombardo did not refer for

discipline any player who tested positive for bumetanide in 2006.  Sometime in late 2006 or 2007, Birch communicated with Lombardo about Lombardo's duties under the Policy.  (Lombardo Dep. at 114-15, 118; Birch Dep. at 45-46.)  Birch told Lombardo that Lombardo did not have the discretion under the Policy to determine whom to refer for discipline, but only to determine whom to test.  (Lombardo Dep. at 114-15; Birch Dep. at 45-46.)  In other words, Birch told Lombardo that if a player tested positive for a banned substance then, assuming the player had no therapeutic reason to be taking the banned substance, the player must be referred to the NFL for discipline.  (See Birch Dep. at 65 ("I advised [Lombardo] that if this situation comes up, he is to refer those matters for discipline.").)  The players contend that this communication between Birch and Lombardo constitutes interference with Lombardo's discretion and is specifically prohibited by the Policy.

**B.   Claims**

The NFLPA raises a single claim in its Complaint, seeking to vacate the arbitration award under a theory of breach of contract.  The NFLPA contends that the arbitration awards must be overturned because they are contrary to public policy, condone the NFL's breaches of fiduciary duty to the players, are contrary to the essence of the Policy, and were rendered by a biased arbitrator.

The Williamses' Amended Complaint contains thirteen counts, all brought under Minnesota common law or statutes.  Count I seeks an injunction against the Williamses' suspensions.  Count II alleges a breach of fiduciary duty.  Count III contends that the NFL aided and abetted breaches of fiduciary duty. Count IV raises a violation of public policy.

Counts V and VI are claims of fraud and constructive fraud.  Counts VII, VIII, and IX raise negligent misrepresentation, negligence, and gross negligence claims.  Count X alleges intentional infliction of emotional distress ("IIED").  Count XI contends that the NFL is vicariously liable for the torts committed by the individual Defendants.  Count XII asserts that Defendants violated Minnesota's Drug and Alcohol Testing in the Workplace Act ("DATWA"), Minn. Stat. § 181.950 et seq., and Count XIII contends that Defendants violated Minnesota's Consumable Products Act ("CPA"), Minn. Stat. § 181.938.  The Amended Complaint claims damages in excess of $10 million.  (Am. Compl. ¶ 105.)

## C.   Standard of Review

### 1.   Preemption

The NFLPA's claims arise under § 301 of the Labor Management Relations Act ("LMRA"), which provides for federal court jurisdiction over all actions for the breach of a labor contract such as the Policy.  29 U.S.C. § 185(a).  Likewise, the Williamses' common-law claims arise under § 301, although they are brought as state-law claims.

Section 301 preempts nearly every state cause of action involving a collective bargaining agreement.  See Oberkramer v. IBEW-NECA Serv. Ctr., Inc., 151 F.3d 752, 756 (8th Cir. 1998) (noting that claims that "are 'substantially dependent' upon an analysis of the terms or provisions of a collective bargaining agreement or are 'inextricably intertwined' with consideration of the terms or provisions of a collective bargaining agreement" are preempted by § 301) (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 220 (1985)).  There can be no question that the Williamses' common-law claims depend on an

analysis of the terms of the Policy and are inextricably intertwined with the Policy. They are therefore preempted and the Court will construe these claims as § 301 claims. See Allis-Chalmers, 471 U.S. at 220 (holding that where state-law claim requires analysis of terms of labor agreement, court may either treat claim as a § 301 claim or dismiss claim as preempted).

However, the Williamses' statutory claims are different from the common-law claims. The statutory claims exist independently of the Policy, because even if the NFL was acting pursuant to the Policy, those actions may still violate state law. "Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. . . . [Therefore] it would be inconsistent with congressional intent . . . to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Allis-Chalmers, 471 U.S. at 212. Both DATWA and the CPA proscribe conduct or establish rights and obligations that exist independently of the Policy, and thus those claims are not preempted.

### 2.    Federal Arbitration Act

The collectively bargained-for Policy requires the parties to submit appeals of discipline decisions to arbitration. Thus, this Court's review of the arbitrator's decision is circumscribed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, which allows a court to set aside an arbitration award only if that award "was procured by fraud, corruption, or undue means," § 10(a)(1), or when "there was evident partiality in the arbitrators." Id. § 10(a)(2). Both the NFLPA and the Williamses argue that the Court should set aside the

10

arbitration awards at issue because of the NFL's alleged bad conduct in not informing players about the presence of bumetanide in StarCaps and because of arbitrator Pash's alleged partiality. They contend that public policy mandates that arbitration awards that condone breaches of fiduciary duties be vacated. They also argue that the awards violate the essence of the Policy and must be set aside on that basis.

The Court's review of the arbitration decision is extremely limited. The Court must afford the arbitrator "an extraordinary level of deference" and must confirm the award as long as "the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority." Stark v. Sandberg, Phoenix & von Gontard, P.C., 381 F.3d 793, 798 (8th Cir. 2004). Further, the Court may vacate the decisions "only for the reasons enumerated in the FAA." Crawford Group, Inc. v. Holekamp, 543 F.3d 971, 976 (8th Cir. 2008) (citing, inter alia, Hall St. Assocs., L.L.C. v. Mattel, Inc., 128 S. Ct. 1396, 1403 (2008)).

**D.     Merits**

**1.     Essence of the CBA**

As the Court noted in the Order granting the preliminary injunction, an arbitration award that does not "draw[] its essence from the collective bargaining agreement" is not entitled to deference from the reviewing Court. United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987). The Court's authority to reverse an arbitration award for failure to comply with the Policy is "exceptionally narrow." Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1440 (8th Cir. 1992). "[A]s long as the

arbitrator is even arguably construing or applying the [Policy] and acting within the scope of his authority," the Court's determination that the arbitrator "committed serious error does not suffice to overturn his decision." <u>Misco</u>, 484 U.S. at 38.

The NFLPA has abandoned the arguments it raised unsuccessfully in the preliminary injunction hearing on this point. (<u>See</u> Order of Dec. 11, 2008, at 13-14.) It now contends that Birch's alleged interference with Lombardo's discretion means that the awards violate the essence of the Policy. Essentially, the Union's argument is that, if Birch had not interfered with Lombardo's ability to exercise his discretion to refer players for discipline, Lombardo would not have referred these players for discipline. They maintain that the Policy requires that neither the NFL nor the NFLPA influence Lombardo's determination to refer players for discipline. (<u>See</u> Policy at 2-3.)

The provision prohibiting any influence on Lombardo was added in 2008, at least one year after Birch's alleged interference with Lombardo. Thus, it is difficult to ascertain how Mr. Pash's decision sanctioned any violation of the Policy when what Birch did was not in contravention of the Policy at the time he did it.

However, even if Birch impermissibly interfered with Lombardo's discretion, and even if absent that interference the players here would not have been disciplined, Mr. Pash's decision still draws its essence from the Policy. The Policy is unequivocal: players are responsible for what is in their bodies, and inadvertent ingestion of a banned substance will not excuse a positive test result. Thus, although it may have been Lombardo's personal, unofficial policy not to refer positive bumetanide tests for discipline prior to his conversation

with Birch, that unofficial policy is not at issue here.  What is at issue is the Policy itself.

There can be no doubt that Mr. Pash's decision construed the language in the Policy, applied

the language of the Policy, and that Mr. Pash acted within the scope of his discretion under

the Policy.  Thus, his decisions do not fail to draw their essence from the collective

bargaining agreement.

### 2.      Partiality of Hearing Officer

The FAA provides specifically that an arbitration award may be set aside "where there

was evident partiality or corruption in the arbitrator[]."  9 U.S.C. § 10(a)(2); see also

Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358-59 (6th Cir. 1989) (applying FAA's

"evident partiality" standard to arbitration award involving collective bargaining agreement);

Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds, 748 F.2d

49 (2d Cir. 1984) (same).  Because the NFLPA agreed in the Policy that either the

Commissioner or his designee would preside over appeal hearings, the NFLPA agreed to a

certain amount of partiality in the arbitrator.  Thus, "the award should be confirmed unless

the objecting party proves that the arbitrator's partiality prejudicially affected the award."

Winfrey v. Simmons Foods, Inc., 495 F.3d 549, 551 (8th Cir. 2007).

In the Order granting the preliminary injunction, the Court determined that the players

had established a substantial question as to Mr. Pash's partiality.  (Order of Dec. 11, 2008,

at 12.)  The Court's determination rested on two factual bases: first, counsel's representation

that at one appeal hearing Mr. Pash refused to allow questioning of Birch, his subordinate,

as to Mr. Pash's (or his office's) involvement in the StarCaps investigation and its aftermath;

and second, the fact that Mr. Pash did not discuss Lombardo's testimony that if he had been asked about StarCaps, he would have merely warned the player away from supplements in general but would not have told the player about the presence of bumetanide in StarCaps. Further discovery has established that neither basis is borne out by the record.

The Court has reviewed Birch's testimony from the appeal hearings.  There is nothing in that testimony or in Mr. Pash's rulings regarding that testimony that in any way evidences bias on the part of Mr. Pash.  The objection noted by counsel in the preliminary injunction hearing simply does not exist.

Similarly, a full reading of Lombardo's hearing testimony establishes that he was willing to tell players about the presence of bumetanide in StarCaps.  In the Saints players' hearing, Lombardo was asked why he would not tell a player that StarCaps contains bumetanide.  He responded, "I would tell them that they have been found to have Bumetanide in it." (Saints players Hr'g T. 114.)  He reiterated, "I would tell them that they were found to have a diuretic in them, which is banned." (Id. at 115.)  Mr. Pash's discussion of Lombardo's testimony is therefore full and fair, and the players and the Union cannot establish bias on this basis.

The players and the Union now argue that additional evidence establishes Mr. Pash's bias.  They claim that Mr. Pash "secretly" gave legal advice to the NFL and to the Vikings regarding the subject matter of the appeals, and that he was therefore disqualified from acting as a hearing officer.  Mr. Pash is the NFL's chief legal officer.  As such, he will undoubtedly be asked to give legal advice to the NFL or to its member teams when a player threatens legal

action.  The fact that Mr. Pash gave advice in this situation was clearly foreseeable, and having not objected to Mr. Pash serving as the arbitrator, the players and the Union cannot now complain about his service.  Moreover, the evidence shows that not only did the players and the Union know that Mr. Pash was giving legal advice to the NFL, but they requested that he serve as Hearing Officer specifically because of his involvement.  Even if Mr. Pash's involvement could somehow establish bias, which is doubtful, the players and the Union have waived any such claim.  Kiernan v. Piper Jaffray Cos., 137 F.3d 588, 593 (8th Cir. 1988).

Mr. Pash was not a partial arbitrator and the Court will not set aside his decision on this basis.

### 3.    Public policy

The NFLPA argues that Mr. Pash's decisions must be set aside because they sanction Lombardo's and the NFL's breaches of fiduciary duty.  Specifically, the NFLPA contends that once Lombardo and the NFL knew that StarCaps contained bumetanide, they owed a duty under New York law to give the players that information.  The Williamses' fiduciary duty claims arise under Minnesota law, but otherwise are similar to the NFLPA's claims.  Both the Union and the players argue that there is an explicit public policy against breaches of fiduciary duties and that the decisions should be overturned because they are contrary to this public policy.

Where, as here, the decisions at issue draw their essence from the parties' collectively bargained agreement, the Court must treat those decisions as if they represented an

agreement between the NFLPA and the NFL as to whether the Policy requires the disclosure the Union and the players contend was required here. <u>Eastern Assoc. Coal Cos. v. United Mine Workers of Am.</u>, 531 U.S. 57, 62 (2000). Put differently, the decisions are "not distinguishable from the contractual agreement." <u>Id.</u> The Court must then decide whether the Policy as interpreted by Mr. Pash "violates some explicit public policy" that is "well defined and dominant" and can be "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." <u>W.R. Grace & Co. v. Local Union 759</u>, 461 U.S. 757, 766 (1983). The question is not whether any behavior by the parties to the Policy violates public policy, but rather whether the Policy itself violates public policy. <u>MidAm. Energy Co. v. Int'l Bhd. of Elec. Workers Local 499</u>, 345 F.3d 616, 620 (8th Cir. 2003). If the Policy does violate an explicit public policy, the Court is "obliged to refrain from enforcing it." <u>W.R. Grace</u>, 461 U.S. at 766. To prevail on this claim the Union and the players must therefore show that a fiduciary duty exists and was breached, that fiduciary duties are an explicit public policy, and that the Policy as interpreted by Mr. Pash violates that public policy by condoning the breach of fiduciary duties.

The NFLPA and the players argue that Defendants breached their duties to the players in two ways. First, they contend that Lombardo's statement that he would not have told a player inquiring about StarCaps that StarCaps contains bumetanide breached not only Lombardo's fiduciary duties to the players but also Lombardo's duties as a physician.

Second, they claim that the NFL Supplement Hotline (the "Hotline")[4] gave incorrect information to players about StarCaps and that the NFL, acting through Birch, did nothing to correct the Hotline's actions.

As discussed above, Lombardo's testimony establishes that, had a player called him to inquire about StarCaps, Lombardo would have told the player that StarCaps contained bumetanide.  There can be no claim of breach of fiduciary duty arising out of Lombardo's alleged refusal to divulge that information.  In addition, Lombardo's decision not to publish specific warnings about StarCaps does not violate his duties to players.  Lombardo testified that he decided to send a general warning about weigh-loss supplements rather than about StarCaps in particular because "the problem is the whole area of weigh reduction products." (Lombardo Dep. at 161.)  Thus, as Mr. Pash found, Lombardo exercised his discretion under the Policy to educate players, and did so in a general way because he believed that all weigh-reduction products, not just StarCaps, carried risks.  The NFLPA and the players may disagree with Lombardo's conclusion, but under the terms of the Policy, the decision on this issue was his to make.  Absent a showing that the decision was outrageous or without any foundation, the Union and the players cannot establish that the decision constituted a violation of whatever fiduciary duties Lombardo may have had.

The NFLPA also contends that the Hotline gave inaccurate information to players regarding StarCaps, that Birch knew the Hotline was giving inaccurate information and did

---

[4]  The NFL and the NFLPA created the Hotline to provide players "with confidential and accurate information about" supplements.  (Greenspan Decl. Ex. 19.)

nothing to correct the situation, and that this constitutes a breach of the NFL's fiduciary duties to the players.

The evidence shows that Birch communicated with the Hotline in 2006 regarding StarCaps, asking whether the Hotline had received inquiries about this particular substance. The Hotline informed Birch that one player had inquired and had been told that, while StarCaps was not banned, the player should avoid taking any supplement because the label might not be accurate and it might in fact contain a banned substance.  (Birch Dep. at 106.) Birch testified that he did not ask the Hotline to give any more specific information to players about StarCaps.  (Id. at 110.)

The information the Hotline gave the player is undisputedly accurate.  The NFLPA and the players contend that the Hotline should have informed players about the presence of bumetanide in StarCaps once the NFL was aware that StarCaps contained bumetanide. While this specific warning might have been preferable, it is not a breach of fiduciary duties to tell players that all supplements are risky and that players should not rely on any supplement's list of ingredients because that list might be incomplete.  The NFL's decision regarding the warnings to give players is not unreasonable.

The administration of the Hotline presents squarely the troubling issues brought forward by this case.  There is no doubt that it would have been preferable for the NFL to communicate with players specifically about the presence of bumetanide in StarCaps.  The NFL's failure to do so is baffling, but it is not a breach of the NFL's duties to its players.  It is clear that this situation arose because the parties to these cases do not trust each other.  The

18

NFL does not trust the Union or the players. The players and the Union do not trust the NFL. No one believes that the opposing parties have any common interests. The situation is deplorable and leads to suspicion and the sort of no-holds-barred litigation tactics so clearly on view here.

Unlike the parties, the Court does not view each party's actions through the lens of suspicion. Through the Hotline, the NFL was attempting to tell players what they already knew: they should not take dietary supplements. NFL players are adults. They are warned repeatedly not to take dietary supplements and that such supplements may cause a positive test for a banned substance. (Greenspan Decl. Exs. 17-20; Policy Appx. F.) It is no doubt true that none of the players here would have taken StarCaps if the NFL had issued a memo saying that StarCaps contained bumetanide. It is also likely that those players, having been warned not to take StarCaps in particular, would have turned to a different supplement to accomplish their weight-loss goals. There is certainly no guarantee that another supplement is any less likely to have a banned substance than is StarCaps, but despite the NFL's and Lombardo's repeated warnings about supplements, players continue to use them.

Mr. Pash determined that the Policy makes players responsible for what is in their bodies. He noted that, if the Union disagreed with this apportionment of liability, it is free to bargain for a different Policy. (Viking players Arbitration R. at 8.) The Union is, in fact, free to bargain for a clause that requires the NFL to inform players specifically when a supplement is found to contain a banned substance. The Policy as written does not contain such a requirement, however. More importantly, the absence of such a requirement does not

19

sanction any breach of fiduciary duties on the part of the NFL or Lombardo.

Having failed to establish that a genuine issue of material fact exists as to whether the NFL or Lombardo breached any fiduciary duties, the NFLPA and the Williamses cannot succeed on their claim that the appeal decisions must be set aside as contrary to public policy. Thus, the NFLPA's Complaint must be dismissed. The Williamses, however, raise claims under Minnesota law that, as noted above, are not preempted by § 301. The claims are discussed below.

### 4.    DATWA and CPA

DATWA sets forth explicit guidelines regarding when and how Minnesota employers can require their employees to submit to drug testing. See Minn. Stat. § 181.951, subd. 1 ("An employer may not request or require an employee or job applicant to undergo drug and alcohol testing except as authorized in this section."). Among other things, DATWA provides that an employee may not be disciplined on the basis of an initial positive test and requires the employer to allow the employee the right to explain a positive test. Id. § 181.953(6) and (10)(a). The NFL concedes that its steroid testing procedures do not comply with the letter of Minnesota law, but argues that the differences are negligible and do not require the Court to invalidate the Williamses' positive tests for bumetanide. The NFL argues that DATWA allows for collective bargaining agreements to provide for protections that exceed DATWA's protections, and further contends that, whatever the merits of the Williamses' DATWA claims, they have failed to exhaust their administrative remedies and thus are precluded from bringing claims under DATWA.

The CPA prohibits a Minnesota employer from taking an adverse action against an employee because the employee "has engaged in the use or enjoyment of lawful consumable products, if the use or enjoyment takes place off the premises of the employer during nonworking hours." Minn. Stat. § 181.938, subd. 2. The Williamses argue that the CPA prohibits the NFL from disciplining them for taking StarCaps, which are a lawful product and were consumed outside of working hours. The NFL responds that the CPA allows employers to restrict the consumption of lawful products if that restriction is related to a bona fide occupational requirement, id. subd. 3(a)(1), and that the Policy's restrictions on the use of steroids and masking agents clearly falls within this exception.

Because the Williamses' state-law DATWA and CPA claims are the only claims remaining in the case, the Court must determine whether it has jurisdiction to consider the merits of the claims. The Williamses' Complaint was removed to this Court on the basis of the federal question jurisdiction provided by the preemption provision of the LMRA. The Court has determined, however, that all § 301 claims must be dismissed. Therefore, the Court does not have federal question jurisdiction over the Williamses' Amended Complaint. In addition, jurisdiction may not be founded on diversity of citizenship. The Williamses are residents of the state of Minnesota (Am. Compl. ¶¶ 2-3), and the NFL, as an unincorporated association of the member teams, is a citizen of each state in which its members are citizens. Iowa Ins. Guar. Ass'n v. New England Ins. Co., 701 F. Supp. 177, 179 (S.D. Iowa 1988). One of the member teams of the NFL is the Minnesota Vikings, which has Minnesota citizenship. Thus, there is not complete diversity.

21

The Williamses urge this Court to exercise supplemental jurisdiction over their state-law claims.  See 28 U.S.C. § 1367(c) (allowing but not requiring the Court to decline to exercise supplemental jurisdiction over a state law claim when it "has dismissed all claims over which it has original jurisdiction").  While the Court agrees with the Williamses that the case is not in a preliminary stage and that the exercise of jurisdiction is within the Court's discretion, it is also true that, with respect to the state-law claims, the issues are not fully developed and, at least in this Court's opinion, genuine issues of material fact remain to be resolved.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("When federal claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction . . . .").  Perhaps most important, however, is the fact that both DATWA and the CPA are statutes reflecting the public policy of the state of Minnesota.  As such, it is more appropriate for a state court to make the sorts of decisions about the applicability of those statutes to the facts at hand.  See, e.g., Ankenbrandt v. Richards, 504 U.S. 689, 705-706 (1992) (federal court may decline to hear a case when it "presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.'") (quoting Colorado River Conservation Dist. v. United States, 424 U.S. 800, 814 (1976)).  The Court therefore declines to exercise supplemental jurisdiction over the Williamses' DATWA and CPA claims and will remand those claims to state court.

**CONCLUSION**

No genuine issues of material fact remain as to whether Defendants violated § 301 of

the LMRA.  Thus, the NFLPA's claims and the Williamses' common-law claims must be dismissed.  The Court declines to exercise supplemental jurisdiction over the Williamses' state statutory claims.

Accordingly,  **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment in Civ. No. 08-6254 (Docket No. 128) is **GRANTED**;

2.      Defendants' Motion for Summary Judgment in Civ. No. 08-6255 (Docket No. 111) is **GRANTED in part** and **DENIED in part**;

3.      Plaintiff's Motion for Summary Judgment in Civ. No. 08-6254 (Docket No. 123) is **DENIED**;

4.      Plaintiffs' Motion for Summary Judgment in Civ. No. 08-6255 (Docket No. 105) is **DENIED**;

5.      In Civ. No. 08-6255, Plaintiffs' common-law claims are **DISMISSED with prejudice**, and the remaining claims are **REMANDED** to Minnesota state court.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May  22, 2009

                                        s/Paul A. Magnuson
                                        Paul A. Magnuson
                                        United States District Court Judge